**IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR LAKE COUNTY, FLORIDA**

**CIVIL DIVISION**

MARVELLE J. BALLENTINE,

*Plaintiff,*

v.

META PLATFORMS, INC.; ACCENTURE LLP;

TASKUS, INC.; GENPACT USA, INC.;

DEVIN S. ANDERSON; KIRKLAND & ELLIS LLP;

and CHRISTOPHER W. KEEGAN,

*Defendants.*

Case No. ______________________

## COMPLAINT FOR DAMAGES

## DEMAND FOR JURY TRIAL

## INTRODUCTION

1. Plaintiff Marvelle J. "Jay" Ballentine operated a mobile RV repair business in Florida, sourcing 100% of his customers through Facebook Groups, Messenger, and Ads. He invested approximately $20,000 in specialized equipment, training, and Meta advertising.

2. On July 4, 2022, Meta Platforms, Inc. permanently disabled Plaintiff's account under its Child Sexual Exploitation ("CSE") enforcement policy. Meta did not identify any content that violated the policy. It has never identified any such content.

3. Meta publicly represents that it reports "all apparent" CSE content to the National Center for Missing and Exploited Children ("NCMEC"). Meta did not report Plaintiff. No federal, state, or local law enforcement agency has contacted Plaintiff in over three years. Either Meta identified an apparent violation and did not report it, or Meta applied its CSE enforcement category where no apparent violation existed.

4. Enforcement was carried out through a joint pipeline operated by Meta and Vendor Defendants Accenture LLP, TaskUs, Inc., and Genpact USA, Inc., in which Vendor Defendants staffed human reviewers for final enforcement determinations. A Vendor Defendant reviewer affirmed the CSE designation after Plaintiff submitted his U.S. passport for identity verification.

5. Plaintiff's business was destroyed. His property remains withheld. No content has been identified. No standard has been cited. No factual basis has been provided.

6. During subsequent litigation in the Northern District of California, Accenture, through its counsel Devin S. Anderson of Kirkland & Ellis LLP, published on a public federal docket the assertion that Plaintiff committed "a legitimate community standards violation" without identifying any content, any standard, or any factual basis. Accenture made this assertion after Anderson acknowledged in writing that no CSE violation occurred and after reviewing Plaintiff's disclosure that he is a survivor of childhood sexual abuse.

7. After Plaintiff filed a related action in the Middle District of Florida naming Anderson as an individual defendant, Christopher W. Keegan, also a partner at Kirkland & Ellis LLP and counsel for Accenture, twice re-added Anderson to communications with Plaintiff after Plaintiff removed Anderson from the email chain and stated in writing that he would not communicate with any named defendant.

8. This action seeks damages.

## JURISDICTION AND VENUE

9. This Court has general jurisdiction over this action under Article V, Section 5(b) of the Florida Constitution.

10. This Court has personal jurisdiction over Defendant Meta Platforms, Inc. under Florida Statutes § 48.193(1)(a)(1) and (1)(a)(2). Meta operated and conducted business in this state by providing platform services, advertising services, and content-moderation services to Plaintiff, a Florida resident, and committed tortious acts within this state causing injury to Plaintiff in this state.

11. This Court has personal jurisdiction over Defendant Accenture LLP under Florida Statutes § 48.193(1)(a)(1) and (1)(a)(2). Accenture operated and conducted business in this state through its content-moderation services affecting Florida users, and committed tortious acts within this state causing injury to Plaintiff in this state.

12. This Court has personal jurisdiction over Defendant TaskUs, Inc. under Florida Statutes § 48.193(1)(a)(1) and (1)(a)(2). TaskUs operated and conducted business in this state through its content-moderation services affecting Florida users, and committed tortious acts within this state causing injury to Plaintiff in this state.

13. This Court has personal jurisdiction over Defendant Genpact USA, Inc. under Florida Statutes § 48.193(1)(a)(1) and (1)(a)(2). Genpact operated and conducted business in this state through its content-moderation services affecting Florida users, and committed tortious acts within this state causing injury to Plaintiff in this state.

14. This Court has personal jurisdiction over Defendant Devin S. Anderson under Florida Statutes § 48.193(1)(a)(2) and (1)(a)(6). Anderson committed tortious acts within this state by publishing defamatory statements on a public federal docket that were accessed in this state and caused reputational and emotional harm to Plaintiff in this state. Anderson caused injury to persons within this state arising out of an act outside this state committed in connection with litigation affecting Plaintiff, a Florida resident.

15. This Court has personal jurisdiction over Defendant Kirkland & Ellis LLP under Florida Statutes § 48.193(1)(a)(2) and (1)(a)(6). Kirkland committed tortious acts within this state by filing defamatory statements on a public federal docket that were accessed in this state and caused reputational and emotional harm to Plaintiff in this state. Kirkland caused injury to persons within this state arising out of an act outside this state committed in connection with litigation affecting Plaintiff, a Florida resident.

16. This Court has personal jurisdiction over Defendant Christopher W. Keegan under Florida Statutes § 48.193(1)(a)(2). Keegan committed tortious acts within this state by directing communications to Plaintiff in Florida that caused additional emotional harm to Plaintiff in this state.

17. Venue is proper in Lake County under Florida Statutes § 47.011. Plaintiff resides in Lake County, Florida. The injuries alleged herein occurred in this county.

## PARTIES

**A. Plaintiff**

18. Plaintiff Marvelle J. "Jay" Ballentine is an individual who operated a mobile RV repair business in Florida, domiciled in Clermont, Lake County, Florida.

19. Plaintiff brings this action in his individual capacity. He does not seek to represent, certify, or recover for any class. The remedies requested are tailored to redress Plaintiff's own injuries.

**B. Defendants**

20. Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation with its principal place of business at 1 Hacker Way, Menlo Park, California 94025. Meta is subject to personal jurisdiction in this state under Florida Statutes § 48.193(1)(a)(1) and (1)(a)(2).

21. Defendant Accenture LLP ("Accenture") is a limited liability partnership organized under the laws of Illinois with its principal place of business in Illinois. Accenture is subject to personal jurisdiction in this state under Florida Statutes § 48.193(1)(a)(1) and (1)(a)(2).

22. Defendant TaskUs, Inc. ("TaskUs") is a Delaware corporation with its principal place of business in Texas. TaskUs is subject to personal jurisdiction in this state under Florida Statutes § 48.193(1)(a)(1) and (1)(a)(2).

23. Defendant Genpact USA, Inc. ("Genpact") is a Bermuda corporation with its principal place of business in New York. Genpact is subject to personal jurisdiction in this state under Florida Statutes § 48.193(1)(a)(1) and (1)(a)(2).

24. Defendant Devin S. Anderson ("Anderson") is an individual and a citizen of the State of Utah, domiciled in Utah. Anderson is a partner at Kirkland & Ellis LLP and served as counsel of record for Accenture in the Northern District of California

action captioned *Ballentine v. Meta Platforms, Inc., et al.*, Case No. 3:25-cv-07671-CRB (the "Federal Action"). Anderson signed the First Motion and the Second Motion on behalf of Accenture. Anderson is subject to personal jurisdiction in this state under Florida Statutes § 48.193(1)(a)(2) and (1)(a)(6).

25. Defendant Kirkland & Ellis LLP ("Kirkland") is a limited liability partnership whose partners are each citizens of States other than Florida. Kirkland is subject to personal jurisdiction in this state under Florida Statutes § 48.193(1)(a)(2) and (1)(a)(6).

26. Defendant Christopher W. Keegan ("Keegan") is an individual and a citizen of the State of California, domiciled in California. Keegan is a partner at Kirkland & Ellis LLP and serves as counsel of record for Accenture LLP in the Federal Action. Keegan appeared on the docket in the Federal Action on September 26, 2025. Keegan is subject to personal jurisdiction in this state under Florida Statutes § 48.193(1)(a)(2).

### C. Defined Terms

27. Accenture LLP, TaskUs, Inc., and Genpact USA, Inc. are referred to collectively as the "Vendor Defendants."

28. Anderson, Kirkland & Ellis LLP, and Keegan are referred to collectively as the "Litigation Defendants."

29. All seven named defendants are referred to collectively as "Defendants."

## FACTS

### Section A — Plaintiff's Business and Platform Dependence

30. Plaintiff enrolled in the National RV Training Academy ("NRVTA"). NRVTA certification provided contractual rights to continuing education through the

NRVTA Alumni Facebook Group, the sole professional development network providing continuing education and field support for competent RV repair services.

31. Plaintiff invested approximately $20,000 in specialized RV repair equipment, training, and Meta advertising, while relying on Facebook's marketing and networking capabilities. At the time of his account termination, Plaintiff sourced 100% of his clients and leads from RV-related Facebook Groups and Facebook advertising. Before termination, Plaintiff had completed over $2,000 in customer transactions through Facebook-sourced leads and had pending service requests valued at another $3,000. Plaintiff agreed to engage in future customer service contracts with foreknowledge that he would have to rely on continuing education benefits conferred to him by the NRVTA.

32. In June 2022, Plaintiff began marketing his RV repair business on Facebook and paid to access tools and services delivered through his Facebook for Business account. Meta billed his credit card in accordance with his 'Facebook for Business' account activity between June 27, 2022 to June 30, 2022.

33. On June 9, 2022, Plaintiff received his first email from 'Meta for Business,' the rebranded successor to Facebook for Business, marking his first commercial interaction with Meta since 2017 when he operated under terms requiring court jurisdiction. This renewed engagement subjected Plaintiff to Meta's Commercial Terms containing a 30-day arbitration opt-out clause.

34. On June 16, 2022, Meta restricted Plaintiff's dormant Meta for Business account, citing policy violations. Meta required and Plaintiff provided phone verification to restore access.

35. The contractual relationship between Plaintiff and Meta (Facebook for Business) was consummated between June 27–30, 2022 when Meta billed Plaintiff's credit card for services delivered. Meta terminated his Facebook and Facebook for Business account on July 4, 2022 before Plaintiff could exercise his contractual right to opt-out of arbitration.

**Section B — The Enforcement Pipeline**

36. Meta and the Vendor Defendants maintained a business arrangement for platform policy enforcement services.

37. Meta and the Vendor Defendants operated a joint platform policy enforcement pipeline in which Meta established policy enforcement guidelines, the Vendor Defendants staffed human reviewers for final policy enforcement decisions including routing, and Meta retained override authority.

38. Vendor Defendant personnel performing final-review enforcement had access to account-level identifiers, including profile photos, names, and in some cases government-issued ID images. The CSE designation was affirmed by a vendor reviewer who, during the identity verification process, had visibility of Plaintiff's face through his profile photo and government-issued ID.

39. Following affirmation of the CSE designation, the reviewing Vendor Defendant executed the operational decision that determined whether Plaintiff's case would: (a) enter the NCMEC reporting workflow triggering mandatory law enforcement notification under 18 U.S.C. § 2258A; or (b) bypass law enforcement entirely through an alternative workflow. This routing decision placed the reviewing Vendor Defendant at the chokepoint between platform enforcement and criminal investigation.

40. Alternative identification under Fla. R. Civ. P. 1.110(g). The identity of the specific Vendor Defendant who conducted Plaintiff's July 4–5, 2022 final review is within Defendants' exclusive possession; accordingly, Plaintiff pleads in the alternative that Accenture LLP, TaskUs, Inc., or Genpact USA, Inc. performed the review that affirmed the CSE invocation, with precise identification to be confirmed from review-session telemetry, queue-assignment records, and tool-access logs.

**Section C — CSE Designation and Non-Report**

41. In 2022, Meta actioned approximately 105.9 million items under its "Child Sexual Exploitation" (CSE) enforcement category across Facebook and Instagram. Of these, 92.2 million occurred on Facebook, and 13.7 million on Instagram.

42. That same year, Meta submitted approximately 26 million CyberTipline reports to the National Center for Missing and Exploited Children (NCMEC) pursuant to 18 U.S.C. § 2258A. No alternative reporting mechanism exists under federal law.

43. The difference between the 105.9 million CSE-labeled enforcement actions and the approximately 26 million NCMEC reports reflects nearly 80 million CSE-labeled actions that were not referred to NCMEC. Section 2258A leaves "apparent violation" determinations to the provider's discretion.

44. Meta's public disclosure states: "Electronic Service Providers (ESPs) are legally obligated to report apparent violations of laws related to child sexual abuse material (CSAM) they become aware of to NCMEC's CyberTipline."

45. Meta's CSE enforcement policy states it removes content that "sexually exploits children." Meta states it "report[s] apparent child exploitation to the National Center for Missing and Exploited Children (NCMEC)."

46. Section 2258A requires reporting "as soon as reasonably possible after obtaining actual knowledge of any facts or circumstances from which there is an apparent violation" of child exploitation laws. Meta retained discretion over which CSE-labeled enforcement actions resulted in permanent account terminations, which were referred to law enforcement, and which were restored.

47. For the approximately 80 million CSE enforcement actions Meta did not report to NCMEC in 2022: (a) Meta identified apparent violations of child exploitation laws in these actions but did not report them to NCMEC; or (b) Meta applied its CSE enforcement category to these actions despite identifying no apparent violations of child exploitation laws.

48. Meta's transparency reports show CSE enforcement actions declined from 30.1 million in Q3 2022 to 4.6 million in Q1 2025, a reduction of approximately 85%.

49. Meta's Transparency Center states the company does not offer appeals for violations with "extreme safety concerns, such as child exploitation imagery." Meta's strikes policy provides that accounts "may be disabled after one occurrence" for severe violations including child sexual exploitation.

50. Meta reversed 993,400 CSE enforcement actions on Facebook in 2022. Of these reversals, 985,300 occurred without user initiated reviews and 8,100 occurred following final human review through the Defendants' joint policy enforcement framework.

51. On January 31, 2024, Meta CEO Mark Zuckerberg testified before Congress that Meta reports "all apparent" CSE content to NCMEC. This representation was reiterated in Meta's April 19, 2024 submission to the Senate Judiciary Committee.

**Section D — The July 4, 2022 Enforcement Event**

52. On July 4, 2022, Meta invoked its CSE policy against Plaintiff and requested identity verification as a precondition to final human review. Plaintiff submitted his U.S. passport. The reviewer had Plaintiff's government-issued identification and profile photograph visible during review and was authorized to validate or invalidate Meta's invocation of its Child Sexual Exploitation (CSE) policy.

53. Within hours of receiving Plaintiff's identification, Meta ratified the permanent termination and routed the matter through a workflow that did not result in a report to the National Center for Missing and Exploited Children.

54. The July 4, 2022 termination eliminated Plaintiff's access to all customer communications, pending appointments, contact information, advertising campaign data, and access to the NRVTA alumni group for continuing education. Plaintiff registered for a new Facebook account in April 2023 in order to access continuing education through the NRVTA Alumni Facebook Group. Meta promptly terminated the new account before Plaintiff could publish any content.

**Section E — Discretionary Enforcement**

55. Meta's deployment of the CSE designation foreclosed review, as its strikes policy allows account disablement after one occurrence for CSE violations. Yet Meta demonstrated discretion for others, as set forth in Section C. Despite this demonstrated discretion, more than three years have elapsed without Meta returning Plaintiff's business data or restoring his right to make and modify contracts.

56. From 2020 to 2025, multiple users were enforced within Meta's sexual-content and Child Sexual Exploitation enforcement family. Each matter proceeded through Meta's enforcement apparatus, including vendor-staffed review queues, to human review, including final decisions.

57. Steven Ertelt's account was flagged under the CSE policy for a medical C-section video. Meta restored Steven Ertelt's account after receiving a reinstatement demand from his counsel. On April 22, 2025, Plaintiff submitted a formal reinstatement demand to Meta which Meta constructively denied.

58. COMP-1 posted content that Meta subsequently confirmed constituted a CSE violation. COMP-1 received a temporary suspension and was reinstated after Meta's CSE confirmation. Meta's own review stated: "We confirmed that it does not follow our Community Standards on child sexual exploitation." Yet Meta imposed only a temporary suspension on COMP-1's account. COMP-1's restoration after Meta-confirmed CSE policy violation demonstrates discretion over sanctions and restoration.

59. Abby Covington, @slut.social, and Betty Tompkins were each enforced under Meta's broader content-policy enforcement family and each was reinstated.

60. Meta restored users flagged under the same enforcement family, including one with a confirmed CSE violation, while permanently excluding Plaintiff—who had no identified violation. Plaintiff's contractual relationship with Meta has not been restored. Plaintiff's access to the contractual rights conferred to him by NRVTA remains severed. Plaintiff's property remains withheld.

**Section F — Plaintiff's Property Interests**

61. Plaintiff held multiple property interests through Meta's platforms: business communications documenting $3,000 in pending transactions; customer relationships generating 100% of business leads; administrative credentials controlling these assets; advertising campaign data; and access to the NRVTA Alumni Group providing continuing education and field support essential to competent business

operations. These interests satisfied all property criteria: precise definition, exclusive control, legitimate exclusivity.

62. The July 4, 2022 termination eliminated Plaintiff's access to the property identified in the preceding paragraph, destroyed stored value, severed commercial relationships, eliminated business operations, and foreclosed Plaintiff's ability to derive the contractual benefits conferred to him by the NRVTA.

**Section G — Post-Enforcement Conduct (October–November 2025)**

63. On October 31, 2025, the parties participated in a court-ordered preservation conference in the Federal Action. During that conference, Plaintiff requested that Defendants confirm whether litigation holds had been keyed to Plaintiff's provided account identifier. Defendants did not confirm that litigation holds were keyed to Plaintiff's provided account identifier.

64. During the October 31, 2025 preservation conference, Plaintiff proposed two existence-only paths to confirm whether a NCMEC CyberTipline report existed for Plaintiff's July 4, 2022 enforcement matter: (a) a yes/no custodian declaration from Meta, or (b) a limited third-party confirmation from NCMEC stating only the existence and date of any report. Defendants declined both options.

65. Plaintiff, proceeding pro se, requested sequential defendant-specific sessions for the preservation conference. Defendants declined, requiring Plaintiff to conduct the conference jointly against both defense teams.

66. On October 4, 2025, Anderson, as counsel for Accenture, responded to Plaintiff's mediation proposal: "Accenture's position is the same as Meta's."

67. On October 28, 2025, Anderson stated: "there is no reason for separate sessions," "the session should be combined with all parties," and "We can join the line provided by Meta, if you forward that information."

68. As of the date of this filing, no federal, state, or local law enforcement agency has contacted Plaintiff regarding the July 4, 2022 enforcement matter. Defendants have not confirmed the existence or nonexistence of a NCMEC CyberTipline report for the enforcement matter. Defendants continue to withhold Plaintiff's account-resident business data.

**Section H — Accenture's Public Docket Publications and Plaintiff's CSA-Survivor Status**

69. The original complaint filed on September 9, 2025 in the Federal Action contained a singular footnote with the following text: "As a CSA survivor, Plaintiff gratefully acknowledges the unwavering support of his wife, whose steady presence made the psychological recovery, and subsequent preparation of this Complaint possible. He further acknowledges his children, especially his eldest, who endured his distance during the preparation of this filing after once celebrating his NRVTA graduation with pride. This work now returns to them, just as their father and husband does."

70. Accenture, through Anderson and Kirkland, reviewed the complaint which contained the footnote before preparing a responsive motion.

71. On September 30, 2025, Plaintiff emailed counsel for Accenture and Meta proposing, among other options: "OPTION 2 — Pause Rule 12; Mediation: Stipulate to suspend Rule 12 motion practice and proceed to mediation, with a joint proposed schedule submitted for the Court's approval."

72. On October 3, 2025, Meta's counsel responded that mediation would not be productive.

73. On October 16, 2025, Accenture, through Anderson and Kirkland, filed a motion to dismiss in the Federal Action (the "First Motion").

74. The First Motion was filed on the public federal court docket and is publicly accessible via the federal Public Access to Court Electronic Records (PACER) system.

75. The First Motion, signed by Anderson, stated: "An alternative explanation for Accenture's recommendation—a legitimate community standards violation by Ballentine—is consistent with the facts alleged in the complaint."

76. The First Motion did not identify any specific content, any specific community standard, or any factual basis supporting the assertion that Plaintiff committed a "legitimate community standards violation."

77. The First Motion did not allege that Plaintiff committed a CSE violation.

78. On October 24, 2025, Plaintiff emailed Anderson requesting that Accenture include clarification in its forthcoming filing that Accenture did not contend Plaintiff violated child protection laws.

79. On October 28, 2025, Anderson sent an email communication to Plaintiff.

80. In that communication, Anderson quoted from the First Motion: "Ballentine alleges there was no CSE violation associated with his account."

81. In that communication, Anderson stated that Accenture's argument "expressly accepts as true" the complaint's assertion that there was no CSE violation and that the First Motion set forth "an alternative explanation... that is unrelated to CSE."

82. In that communication, Anderson stated: "In Accenture's forthcoming motion to dismiss… we will include language reinforcing this point."

83. On October 31, 2025, Accenture, through Anderson and Kirkland, filed a second motion to dismiss in the Federal Action (the "Second Motion").

84. The Second Motion changed the language from "a legitimate community standards violation by Ballentine" to "a legitimate violation of another community standard unrelated to CSE."

85. The Second Motion did not identify any specific community standard that Plaintiff allegedly violated, any specific content that Plaintiff allegedly posted, or any factual basis for the revised statement.

86. The First Motion did not state that resolving any issue presented required the Court to determine whether Plaintiff violated any specific community standard, and it did not identify any such standard or content to support the asserted "legitimate community standards violation."

87. The First Motion did not explain how the "legitimate community standards violation" assertion corresponded to any identified content, any identified standard, or any identified enforcement category other than the child-safety context discussed throughout the filing.

88. The procedural posture of the First Motion was a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), which tests the legal sufficiency of the complaint's allegations.

89. The First Motion's legal arguments addressed statute of limitations, causation, Section 230 immunity, and the adequacy of Plaintiff's comparator

allegations. None of these arguments required or depended upon a determination that Plaintiff committed a community standards violation.

90. The statement asserting "a legitimate community standards violation by Ballentine—is consistent with the facts" was not necessary to, and did not support, any legal argument presented in the First Motion. The enforcement pipeline that Accenture staffed restored a user with a confirmed CSE violation while permanently excluding Plaintiff, who had no identified violation; the assertion that Plaintiff's enforcement reflected a "legitimate" violation was inconsistent with the operational record of the system Accenture operated.

91. The conduct alleged in the preceding paragraphs—asserting an unsubstantiated violation against Plaintiff in a public filing without identifying content, a standard, or a factual basis—is of the same character as the conduct alleged in the Federal Action: applying an unsubstantiated CSE designation to Plaintiff's account without identifying violative content, filing a CyberTipline report, or citing a factual basis.

92. Plaintiff's reputation was harmed in Florida as a result of the defamatory publication.

93. Plaintiff suffered severe emotional distress. Plaintiff had disclosed his status as a CSA survivor in the federal complaint. The First Motion's public filing of CSE-adjacent references and implications without factual basis, in that context, caused Plaintiff severe emotional distress.

94. The First Motion consists of seventeen pages of substantive text. It contains twenty-six instances of "Child Sexual Exploitation" or "CSE," forty-one references to Plaintiff by name or direct reference, and nine instances in which

Plaintiff's name appears in the same sentence as CSE-related terminology. Five of those nine instances are concentrated within the first three pages. In the Background section, Plaintiff's name appears seven times, with six of those seven references placing Plaintiff's name in the same sentence or immediately adjacent sentence as CSE-related terminology.

**Table 1: Publication Metrics**

| Metric | Value |
|---|---|
| Total pages of substantive text in First Motion | 17 |
| "Child Sexual Exploitation" or "CSE" instances | 26 |
| Total references to Plaintiff by name or direct reference | 41 |
| Instances of Plaintiff's name in same sentence as CSE terminology | 9 |
| Instances concentrated in first 3 pages of memorandum | 5 |
| References to Plaintiff in Background section | 7 |
| Of those, references paired with CSE terminology | 6 |
| Content identified to support "legitimate violation" assertion | **0** |
| Community standard identified to support assertion | **0** |
| Factual basis provided for assertion | **0** |

**Table 2: Frequency and Concentration Ratios**

| **Calculation** | **Result** |
|---|---|
| CSE references per page | 1.53 |
| Plaintiff references per page | 2.41 |
| Percentage of Background references to Plaintiff paired with CSE | 85.7% |
| Percentage of all Plaintiff-CSE pairings in first 3 pages | 55.6% |

95. The assertion that Plaintiff committed a "legitimate community standards violation" was not necessary to any Rule 12(b)(6) defense Accenture raised. Accenture's motions raised failure to state a claim, preemption, and immunity. None required asserting that Plaintiff actually committed a violation. The assertions and CSE-adjacent pairings were not pertinent to any issue before the court.

96. Accenture published both assertions on a public federal docket accessible to any member of the public, including prospective counsel, prospective clients, and members of Plaintiff's professional and personal community in Florida where he resides.

**Section I — Post-Filing Communications**

97. On February 9, 2026, Plaintiff filed a related action in the Middle District of Florida (the "Florida Federal Action"). The complaint alleges that Anderson signed filings that placed Plaintiff's name in proximity to child sexual exploitation terminology at least nine times and discloses Plaintiff's status as a survivor of childhood sexual abuse.

98. On February 9, 2026, Plaintiff sent an email to Anderson, with copies to Keegan and counsel for Meta, attaching the complaint filed in the Florida Federal Action. The email stated: "The complaint, attached hereto, names Accenture LLP, Kirkland & Ellis LLP, Meta Platforms, Inc., and you individually as defendants." The email stated: "This will be the final direct correspondence from Plaintiff to you."

99. On February 9, 2026, Plaintiff sent a separate email to Keegan and to counsel for Meta proposing a stipulation to continue the Rule 12 hearing in the Federal Action. Plaintiff did not include Anderson on the communication.

100. On February 10, 2026, Keegan responded by email. Keegan stated that Plaintiff "should continue to direct all communications to both Mr. Anderson and myself on behalf of Accenture." Keegan added Anderson to the email chain.

101. Plaintiff replied to Keegan's email and removed Anderson from the chain. Plaintiff stated that he did "not intend to maintain direct communications with any named defendant in the Florida action." Plaintiff stated that the representation structure—in which Kirkland & Ellis LLP is a named defendant, Anderson is both a partner and a co-defendant, and both continue to represent co-defendant Accenture LLP—"raises difficult boundary questions." Counsel for Meta were copied.

102. On February 10, 2026, Keegan sent a second email. Keegan again added Anderson to the chain. Keegan stated: "Notice attorneys include Mr. Anderson and myself, so please continue to include him on communications."

103. Plaintiff replied to Keegan's second email and again removed Anderson from the chain.

104. Keegan sent both emails after receiving the February 9, 2026 notice to Anderson stating it would be the final direct correspondence from Plaintiff to Anderson, and after receiving the complaint as an attachment to that notice.

105. Counsel for Meta were copied on the February 9, 2026 notice to Anderson and on both of Plaintiff's replies to Keegan.

**COUNT I**

**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

*(Against Meta Platforms, Inc., Accenture LLP, TaskUs, Inc., and Genpact USA, Inc.)*

106. Plaintiff incorporates by reference Facts Sections A, B, C, D, E, and F.

107. Plaintiff operated a mobile RV repair business in Florida and maintained existing and prospective business relationships with customers and prospective customers formed and maintained through Defendants' platforms, including ongoing customer communications and scheduled service appointments maintained through Facebook-based communications.

108. At the time of the July 4, 2022 enforcement event, Plaintiff sourced 100% of his clients and leads from RV-related Facebook Groups and Facebook advertising, had completed over $2,000 in customer transactions through Facebook-sourced leads, and had pending service requests valued at approximately $3,000.

109. Defendants knew of Plaintiff's existing and prospective business relationships because Plaintiff used Defendants' platforms to advertise, communicate with customers, manage business communications, and operate and maintain his customer-facing sales pipeline through Meta's services. Meta billed Plaintiff's credit card for advertising services between June 27 and June 30, 2022.

110. On or about July 4, 2022, Meta invoked a Child Sexual Exploitation ("CSE") enforcement designation against Plaintiff without identifying any violative content, required Plaintiff to submit government-issued identification as a precondition to final human review, and permanently disabled Plaintiff's Facebook account and associated business and advertising access. A reviewer employed by one of the Vendor Defendants conducted the final human review within Meta's enforcement framework with Plaintiff's profile photograph and government-issued identification visible and affirmed the CSE designation. Meta ratified the permanent disablement and routed the matter through a workflow that did not result in a report to the National Center for Missing and Exploited Children.

111. The permanent disablement and resulting loss of platform access intentionally and directly interfered with Plaintiff's existing and prospective business relationships by severing Plaintiff's access to customer communications, pending appointments, and customer contact information necessary to maintain, complete, and continue those relationships.

112. Defendants were not parties to Plaintiff's customer relationships and had no legal justification or privilege to disrupt those relationships through a baseless CSE designation and identity-visible final-review process that resulted in permanent disablement and loss of customer communications. Plaintiff alleges that the interference was intentional and unjustified, and was carried out through improper means, including misuse of the CSE enforcement designation without identified violative content and the permanent disablement decision affirmed while Meta restored other users flagged under the same enforcement family, including one with a confirmed

CSE violation, while Plaintiff—who had no identified violation—remained permanently excluded.

113. As a direct and proximate result of Defendants' intentional and unjustified interference, Plaintiff suffered damages, including loss of existing and prospective business relationships, loss of revenue and business opportunities, loss of goodwill, and loss of approximately $3,000 in pending service requests, in an amount not less than Two Hundred Fifty Million Dollars ($250,000,000).

**COUNT II**

**CONVERSION**

*(Against Meta Platforms, Inc.)*

114. Plaintiff incorporates by reference Facts Sections A, C, D, and F.

115. Plaintiff owned, created, and had the right to immediate possession of specific, identifiable property interests stored in and associated with his account access, including: (a) business communications and message threads; (b) customer contact information and appointment-related communications stored in account communications; and (c) advertising campaign data and associated account-resident business records.

116. On or about July 4, 2022, Meta permanently disabled Plaintiff's account access and withheld Plaintiff's ability to access, retrieve, possess, or control the property identified above. Meta thereby exercised dominion and control over Plaintiff's identifiable property inconsistent with Plaintiff's rights.

117. Plaintiff sought restoration of account access and return of the property through the platform's appeal and identity-verification process, including submission of identity verification materials. Meta refused and continues to refuse to restore

Plaintiff's access or return Plaintiff's identifiable property, and Plaintiff remains unable to access his account-resident business data and records.

118. As a direct and proximate result of Meta's conversion, Plaintiff suffered damages, including loss of access to and use of the converted property, destruction of stored value, and consequential business harm, in amounts to be proven at trial.

## COUNT III

## DEFAMATION (LIBEL)

*(Against Accenture LLP, Devin S. Anderson, and Kirkland & Ellis LLP)*

119. Plaintiff incorporates by reference Facts Sections C, G, and H.

120. On October 16, 2025, Accenture, through Anderson and Kirkland, filed the First Motion on the public federal court docket, accessible to third parties through PACER.

121. The statement was of and concerning Plaintiff. The First Motion identified Plaintiff by name.

122. The First Motion asserted "a legitimate community standards violation by Ballentine—is consistent with the facts" in a filing whose textual characteristics are set forth in Section H of this Complaint. The publication conveyed a defamatory meaning.

123. The publication was false and defamatory by implication in that it conveyed to readers that Plaintiff engaged in a CSE violation or child-protection-law violation warranting enforcement action. Plaintiff did not commit a CSE violation or a child-protection-law violation.

124. After the First Motion was filed, Anderson stated in writing that Accenture "expressly accepts as true" the complaint's assertion that there was no CSE violation, stated that Accenture would include language reinforcing this point in its forthcoming

motion, and Accenture, through Anderson and Kirkland, later changed its phrasing to reference "another community standard unrelated to CSE" without identifying any standard or content.

125. Accenture, Anderson, and Kirkland published the statement with at least negligence concerning its truth or falsity. The First Motion asserted a "legitimate" violation without identifying any content, any standard, or any factual basis.

126. Alternatively, Accenture, Anderson, and Kirkland published the statement with express malice. Anderson acknowledged in writing that Accenture accepted as true the absence of any CSE violation. Accenture, through Anderson and Kirkland, then filed the Second Motion asserting "a legitimate violation of another community standard unrelated to CSE" without identifying any content, any standard, or any factual basis. These facts support an inference of knowledge of falsity or reckless disregard for the truth.

127. The assertion of a "legitimate" violation of an unspecified community standard—in a filing using CSE terminology in close proximity to Plaintiff's name at least nine times—tends to prejudice Plaintiff in the eyes of a substantial and respectable minority of the community.

128. As a direct and proximate result of the defamatory publication by Accenture, Anderson, and Kirkland, Plaintiff suffered damages, including injury to reputation and severe emotional distress.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(Against Meta Platforms, Inc., Accenture LLP, Devin S. Anderson, Kirkland & Ellis LLP, and Christopher W. Keegan)*

129. Plaintiff incorporates by reference Facts Sections A, C, D, E, G, H, and I.

130. On July 4, 2022, Defendants invoked Meta's Child Sexual Exploitation enforcement designation against Plaintiff without identifying any content that violated the policy, required Plaintiff to submit his U.S. passport as a precondition to final human review, and permanently disabled his accounts after a reviewer affirmed the CSE invocation with Plaintiff's profile photograph and government-issued identification visible at the decision point. Defendants routed the matter through a workflow that did not result in a NCMEC report. No law enforcement agency has contacted Plaintiff in more than three years.

131. The permanent disablement branded Plaintiff under an enforcement category associated with child sexual exploitation, foreclosed his business operations and professional access, and carried foreseeable consequences, including that attorneys have declined to represent Plaintiff upon learning of the designation. No content was identified. No standard was cited. No factual basis was provided.

132. In April 2023, Plaintiff registered a new Facebook account to access continuing education through the NRVTA Alumni Facebook Group. Meta terminated the account before Plaintiff could publish any content. Defendants restored users flagged under the same enforcement family during the same general period, including one user whose content Meta confirmed constituted a CSE violation, while permanently excluding Plaintiff, who had no identified violation. Defendants had the ability and occasion to stop the harm and chose not to do so.

133. Accenture participated in the enforcement pipeline that originated the CSE designation and staffed the final human review within Meta's enforcement framework. More than three years later, and after Plaintiff disclosed his CSA-survivor status, Accenture, through Anderson and Kirkland, published on a public federal docket

the assertion that Plaintiff committed "a legitimate community standards violation" without identifying any content, standard, or factual basis, while repeatedly pairing Plaintiff's name with CSE terminology. Accenture published this assertion after its counsel acknowledged in writing that no CSE violation occurred. Accenture's second filing revised the assertion but again identified nothing. Neither assertion has been clarified, substantiated, or withdrawn.

134. The First Motion placed Plaintiff's name in close textual proximity to child sexual exploitation terminology at least nine times, with five such instances concentrated within the first three pages of the memorandum. The textual characteristics of the First Motion are set forth in Section H.

135. Accenture, through Anderson and Kirkland, published the assertion after reviewing Plaintiff's CSA-survivor disclosure contained in the federal complaint.

136. The assertion that Plaintiff committed a "legitimate community standards violation" was not necessary to any defense raised in Accenture's Rule 12(b)(6) motions. Accenture's motions raised failure to state a claim, preemption, and immunity. None required asserting that Plaintiff actually committed a violation. The assertions and CSE-adjacent pairings were not pertinent to any issue before the court.

137. These publications converted the private enforcement harm into a public record and ratified the original CSE designation by asserting on a public docket that it reflected a "legitimate" violation Accenture could not and did not support.

138. Keegan engaged in intentional or reckless conduct by twice adding Anderson to email communications with Plaintiff after Plaintiff had removed Anderson from the chain, after receiving Plaintiff's written refusal and stated basis for that

refusal, and after receiving the February 9, 2026 notice stating it would be the final direct correspondence from Plaintiff to Anderson.

139. Keegan acted with knowledge of the complaint's allegations, including Plaintiff's disclosed status as a survivor of childhood sexual abuse, and with knowledge that Anderson is alleged to have caused Plaintiff severe emotional distress.

140. Keegan's conduct, in the context of Plaintiff's disclosed status as a survivor of childhood sexual abuse and Keegan's knowledge that Anderson is the individual alleged to have caused Plaintiff severe emotional distress, was extreme and outrageous.

141. Keegan's conduct caused Plaintiff additional severe emotional distress, including aggravation of the harms described in this complaint.

142. The preceding paragraphs constitute a single escalating course of conduct: Defendants first branded Plaintiff under a child sexual exploitation enforcement category without identified content, then continued his exclusion across accounts regardless of his conduct, and restored others flagged under the same enforcement family — including one with a confirmed CSE violation — while maintaining Plaintiff's permanent exclusion; then a defendant that participated in the originating enforcement published on a public federal docket that Plaintiff committed a "legitimate" violation without basis and after acknowledging no CSE violation — doing so after learning Plaintiff is a CSA survivor; then, after Plaintiff filed suit naming the responsible individual, that individual's partner forced continued contact between Plaintiff and the named individual. This course of conduct exceeds all bounds of decency tolerated in a civilized community.

143. Defendants intended to cause severe emotional distress or acted with reckless disregard of the high probability their conduct would do so. Defendants

understood that a baseless CSE designation carries the stigma of association with child sexual exploitation and triggers foreseeable fear of criminal investigation under 18 U.S.C. § 2258A. Accenture understood that publicly asserting a "legitimate" violation and pairing Plaintiff's name with CSE terminology—after acknowledging no violation and after learning of Plaintiff's survivor status—would inflict acute distress.

144. Defendants' conduct was a factual and proximate cause of Plaintiff's severe emotional distress. The distress originated with the July 4, 2022 enforcement event and was intensified by Accenture's October 2025 publications and Keegan's February 2026 conduct. Plaintiff, a CSA survivor branded under a child sexual exploitation category without basis and then subjected to public assertions that he committed a "legitimate" violation by a defendant that knew otherwise, and then forced into continued contact with the named individual, suffered humiliation, mental anguish, and physical manifestations of distress.

**COUNT V**

**CIVIL CONSPIRACY (ENFORCEMENT)**

*(Against Meta Platforms, Inc., Accenture LLP, TaskUs, Inc., and Genpact USA, Inc.)*

145. Plaintiff incorporates by reference Facts Sections A, B, C, D, F, and G.

146. Defendants reached an agreement and understanding to implement and carry out the July 4, 2022 account-level enforcement event through a joint platform policy enforcement pipeline in which Meta established enforcement guidelines and the Vendor Defendants staffed human reviewers for final enforcement decisions, with Meta retaining override authority, and in which the final-review step included identity-visible review and a discretionary routing determination at the enforcement chokepoint.

147. In furtherance of the agreement and understanding, Defendants committed overt acts including: (a) invoking and applying a CSE enforcement designation to Plaintiff without identifying violative content; (b) requiring identity verification as a precondition to final human review; (c) conducting and/or affirming identity-visible final human review with Plaintiff's profile photograph and government-issued identification visible at the decision point; (d) ratifying permanent disablement under the CSE designation; (e) routing the matter through a workflow that did not result in a report to the National Center for Missing and Exploited Children; and (f) withholding Plaintiff's access to business communications, customer contact information, and advertising campaign data and records.

148. Defendants conspired to commit, and did commit, unlawful acts and lawful acts by unlawful means, including the torts alleged in Count I (Tortious Interference with Business Relationships), Count II (Conversion), and Count IV Phase 1 (Intentional Infliction of Emotional Distress).

149. As a direct and proximate result of the conspiracy and overt acts in furtherance thereof, Plaintiff suffered damages including economic injury, loss of business relationships, deprivation of identifiable property interests, loss of goodwill, and severe emotional distress, in amounts to be proven at trial.

## COUNT VI

## CIVIL CONSPIRACY TO DEFAME

*(Against Accenture LLP, Devin S. Anderson, Kirkland & Ellis LLP, Meta Platforms, Inc., and Christopher W. Keegan)*

150. Plaintiff incorporates by reference Facts Sections C, G, H, and I.

151. Accenture and Meta operated a joint content moderation pipeline prior to and independent of the Federal Action. The Federal Action alleges that Accenture and Meta engaged in a conspiracy to deprive Plaintiff of contractual rights through the joint maintenance of a CSE designation that was applied without identified violative content, without a CyberTipline report, and without law enforcement contact.

152. In the course of the Federal Action, Accenture, through Anderson and Kirkland, and Meta reached an agreement or understanding to pursue a common litigation objective, as evidenced by the following: On October 4, 2025, Anderson stated "Accenture's position is the same as Meta's." On October 28, 2025, Anderson stated "there is no reason for separate sessions," "the session should be combined with all parties," and "We can join the line provided by Meta, if you forward that information."

153. Meta, through its counsel Orrick, Herrington & Sutcliffe LLP, filed its motion to dismiss on October 15, 2025. Accenture, through Anderson and Kirkland, filed the First Motion on October 16, 2025.

154. Meta's motion refers to Plaintiff as "Plaintiff." Meta's motion does not assert that Plaintiff committed any violation. Meta's motion does not place Plaintiff's name in proximity to CSE terminology.

155. The First Motion, signed by Anderson on behalf of Kirkland in defense of Accenture, refers to Plaintiff as "Ballentine." The First Motion places "Ballentine" in the same sentence or adjacent sentence as CSE terminology nine times. The First Motion asserts "a legitimate community standards violation by Ballentine" without identifying content, standard, or factual basis.

156. The motions were filed twenty-four hours apart following the coordination set forth in paragraphs 66 and 151.

157. In furtherance of the agreement, Accenture, through Anderson and Kirkland, committed the following overt acts: (a) filed the First Motion on October 16, 2025, containing the statement "a legitimate community standards violation by Ballentine—is consistent with the facts" with no content, no standard, and no factual basis identified, in a filing using CSE terminology in close proximity to Plaintiff's name at least nine times; and (b) filed the Second Motion on October 31, 2025, changing the language to "a legitimate violation of another community standard unrelated to CSE" without identifying any standard or content.

158. The overt acts identified in the preceding paragraph are of the same character as the conduct alleged in the Federal Action: attributing an unsubstantiated violation to Plaintiff in a public forum without identifying content, a standard, or a factual basis. The Federal Action alleges that the original enforcement event followed the same pattern—a CSE designation applied without identified violative content, without a CyberTipline report, and without law enforcement referral.

159. Keegan, acting as counsel for Accenture and as a partner at Kirkland, furthered the common objective of the conspiracy by twice adding Anderson to communications with Plaintiff after Plaintiff had removed Anderson from the chain and after receiving Plaintiff's written refusal and stated basis for that refusal.

160. Each re-addition of Anderson to the email chain occurred after Plaintiff had removed Anderson and after Keegan had received the February 9, 2026 notice attaching the complaint and stating it would be the final direct correspondence from Plaintiff to Anderson.

161. As a direct and proximate result of the conspiracy, Plaintiff suffered damages, including injury to reputation and severe emotional distress.

## COUNT VII

## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Fla. Stat. § 501.204)

*(Against Meta Platforms, Inc., Accenture LLP, TaskUs, Inc., and Genpact USA, Inc.)*

162. Plaintiff incorporates by reference Facts Sections A, B, C, D, E, F, and G.

163. Plaintiff is a person who suffered actual damages as a result of Defendants' unfair and deceptive acts or practices in the conduct of trade or commerce. Plaintiff lost money or property including loss of business data, customer communications, and foreclosed return on business investments. Meta and each Vendor Defendant engaged in trade or commerce within the meaning of Fla. Stat. § 501.203 by providing platform services, advertising services, and content-moderation services.

164. Defendants engaged in deceptive acts or practices likely to mislead a consumer acting reasonably in the same circumstances by: (a) applying a CSE enforcement designation to Plaintiff without identifying violative content; (b) requiring identity verification as a precondition to final review under that designation; (c) permanently disabling Plaintiff's account under the CSE designation while routing the enforcement matter through a non-report workflow inconsistent with the stated justification; and (d) in public filings, asserting that an unspecified "legitimate" community-standards violation by Plaintiff explained the enforcement, later revised to reference another unspecified standard, without identifying any content or standard. A reasonable consumer would be misled by a CSE designation that did not correspond to an actual CSE violation and that was not reported to NCMEC as would be expected for actual CSE violations under 18 U.S.C. § 2258A.

165. Meta publicly represents it reports "all apparent" CSE content to NCMEC. Meta labeled Plaintiff under CSE but did not report him. A reasonable consumer would

understand a CSE designation to correspond to an apparent violation reported to law enforcement. The designation did not correspond to a report. That is the deception.

166. Defendants engaged in unfair practices that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers by: (a) exercising discretion at the enforcement chokepoint to route matters into a non-report workflow or a reporting workflow without transparency; (b) permanently withholding users' account-resident business property after enforcement without providing a mechanism for return. These practices offend established public policy and cause substantial injury that consumers could not reasonably avoid and that is not outweighed by any countervailing benefit.

167. Defendants' conduct was unconscionable in that Defendants exercised enforcement discretion for some users flagged under the same enforcement family during the same general period while permanently excluding Plaintiff, and in that the CSE designation carried extraordinary stigma and foreseeable consequences that Defendants understood and imposed without identifying violative content.

168. Defendants' deceptive, unfair, and unconscionable acts and practices were a direct cause of Plaintiff's actual damages.

169. As a direct result, Plaintiff suffered actual damages including loss of business data, customer communications valued at approximately $3,000, foreclosed return on approximately $20,000 in business investments, loss of business relationships and revenue, and additional damages to be proven at trial.

170. Plaintiff seeks declaratory and injunctive relief under Fla. Stat. § 501.211(1) in addition to actual damages under § 501.211(2). The declaratory and injunctive relief sought under § 501.211(1) is available "without regard to any other remedy or relief to

which a person is entitled." The relief sought targets ongoing, systems-level practices requiring prospective changes to Defendants' enforcement architecture that cannot be compensated through monetary damages.

171. Plaintiff seeks declaratory and injunctive relief including, but not limited to: a public transparency dashboard for enforcement category metrics, updated at least quarterly, reporting total enforcement actions, permanent disablements, review requests and restoration rates, percentage of human reviews where user-identifying information was visible, and for categories with statutory reporting obligations, the ratio of enforcements to statutory reports filed; a user-accessible portal where any U.S. user with prior account-administration rights over a disabled account may request and receive confirmation of whether a NCMEC CyberTipline report was filed and the date of any such filing; a data export mechanism for permanently disabled accounts providing machine-readable export of account-resident data upon request, with exceptions for content involving minors, content under law enforcement preservation, and content forming the basis of NCMEC reports; audit log retention for five years sufficient to show timestamp, reviewer role, whether identity-revealing imagery was displayed, and written rationale for any masking exceptions; and a vendor accountability disclosure requiring each Vendor Defendant to disclose annually the number of users who contacted it seeking review of permanent exclusion decisions and the number referred back to Meta without independent review.

172. Plaintiff seeks attorneys' fees under Fla. Stat. § 501.2105 and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Award compensatory damages on all counts, including but not limited to: loss of existing and prospective business relationships; loss of revenue, business opportunities, and goodwill; loss of and deprivation of identifiable business property; foreclosed return on business investments; consequential damages; damages for injury to reputation; and damages for severe emotional distress, in an amount not less than $250,000,000.

B. Award costs of suit.

C. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Fla. R. Civ. P. 1.430(b), Plaintiff demands a trial by jury on all issues so triable.

Date: March 2, 2026

Respectfully submitted,

Marvelle J. Ballentine
Plaintiff, *pro se*
7862 W. Irlo Bronson Memorial Hwy #82
Kissimmee, FL 34747
(407) 794-6503
jayballentine@protonmail.com